UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 7377 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| DaVINCI MOORE and BARBARA A. SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>

Metropolitan Life Insurance Company ("MetLife") brought this interpleader suit under 28 U.S.C. § 1335(a) against DaVinci Moore and Barbara Smith to resolve their competing claims to the benefits of a life insurance policy held by Willie Moore ("Decedent"), who died on April 26, 2017. Doc. 1. After MetLife deposited the policy's funds in the Clerk's registry account and was discharged from further liability, Docs. 10, 18 (Bucklo, J.), the court held a bench trial between Moore and Smith—both proceeding *pro se*—to determine the policy's beneficiary. Doc. 48. After the trial, and at the court's request, Doc. 49, MetLife submitted additional evidence concerning the policy, Doc. 50.

Pursuant to Civil Rule 52(a), the court enters the following Findings of Fact and Conclusions of Law. The Findings of Fact are based on the evidence presented at the bench trial and the evidence MetLife filed several weeks later, which drew no objection from Moore or Smith. To the extent that any Findings of Fact may be considered Conclusions of Law, they shall be deemed Conclusions of Law, and vice versa. After carefully considering the evidence and assessing the witnesses' credibility, the court awards judgment to Smith in the amount of the funds currently in the Clerk's registry account for this case.

**Findings of Fact**

1. MetLife issued a life insurance policy (Policy No. 896431649UL) with a face value of $40,000 to Decedent on September 1, 1989. Doc. 50-1 at 443. When the policy issued, Decedent designated his son, Moore, as the policy's beneficiary. *Id*. at 68, 456.

2. In June 2013, Decedent created an online account with MetLife to manage his life insurance policy. Doc. 50 at ¶¶ 4-6. Decedent made his 2016 and 2017 monthly premium payments for the MetLife policy through an automatic debit connected with his Chase bank account. *Id*. at ¶ 11.

3. Decedent's health began declining in late 2016. Doc. 48, Moore Testimony. At all relevant times, Moore resided in the Chicago area and Moore's son, DaVinci Moore, Jr. ("Moore Jr."), lived with Decedent in Chicago. *Ibid*. As Decedent's illness became more serious, Smith, Decedent's daughter, came from Minnesota to stay with him in Chicago between March and May 2017. *Id*., Smith Testimony. Doris Walker and "Joyce," Moore's sister and cousin, respectively, also stayed with Decedent while he was ill. *Id*., Moore Testimony. In addition, Decedent's friend Carol occasionally spent the night at his home. *Ibid*.

4. During a hospital visit in early April 2017, Decedent's doctors told him that he had terminal cancer. *Ibid*. Several family members—including Moore, Smith, and Walker—were present for that conversation, which took place in the afternoon. *Ibid*.; *id*., Walker Testimony. Although Moore did not recall the precise day that conversation occurred, and no party introduced Decedent's medical records, Moore testified that Decedent called the police (of which more in a moment) the day after the conversation. *Id*., Moore Testimony. Because the court finds Moore's basic timeline credible, and because the police report Moore submitted to MetLife reflects that Decedent called the police on April 9, 2017, Doc. 50-1 at 80-82, the court

finds that Decedent and his family learned that his cancer was terminal during the afternoon of April 8, 2017.

5. On April 8, 2017 at around 10:57 a.m. Eastern time, MetLife received a request through Decedent's online account to change the beneficiary of his life insurance policy from Moore to Smith. Doc. 50-2 at 3; Doc. 50 at ¶ 3.

6. To change a life insurance beneficiary through an online account, MetLife first required the policyholder to enter his username and password. Doc. 50 at ¶ 8. MetLife collected the Internet Protocol ("IP") address associated with all such requests. *Ibid*. The IP address associated with the April 8, 2017 beneficiary change request for Decedent's policy identified the internet service provider as Comcast Cable Communications in Chicago, Illinois. *Id*. at ¶¶ 2, 9.

7. After acknowledging receipt of the beneficiary change request in an April 8, 2017 email to will9333@comcast.net—the email address associated with Decedent's online MetLife account—MetLife on April 11, 2017 approved the beneficiary change from Moore to Smith. *Id*. at ¶¶ 3, 8, 13. That same day, MetLife sent a letter to Decedent's home address confirming the beneficiary change. *Id*. at ¶¶ 8, 13.

8. When Decedent and his family returned home from the hospital on April 8, 2017 immediately after learning that his illness was terminal, the family cooked and ate a meal. Doc. 48, Moore Testimony; *id*., Walker Testimony. The next day, Decedent called the police after he discovered that an expandable file folder containing various important documents, including Moore Jr.'s social security card, was missing. *Id*., Moore Testimony; Doc. 50-1 at 81-82.

9. According to the Incident Report prepared by the Chicago Police Department that Moore faxed to MetLife on May 1, 2017, Decedent spoke with the police around 4:37 p.m. on

April 9, 2017. Doc. 50-1 at 81-82. He estimated that his file folder went missing between April 8, 2017 at 9:00 a.m. and April 9, 2017 at 4:00 p.m. *Ibid*.

10. Around the same time, Decedent called to freeze his Chase credit card account. *Id*. at 83; Doc. 48, Moore Testimony. Realizing that Moore Jr.'s social security card was in the missing folder, Decedent instructed Moore Jr. to log onto Decedent's laptop computer and "lock" his social security number. Doc. 48, Moore Jr. Testimony.

11. Several days after Decedent discovered that the file folder was missing, Smith returned Moore Jr.'s social security card. *Ibid*. When Moore Jr. asked Smith how she had obtained his card, she told him that she had found it. *Ibid*.

12. After discovering that his file folder was missing, Decedent instructed Moore to go downstairs to open a safe. *Id*., Moore Testimony. The safe contained paperwork related to various life insurance policies, including the original contract for Decedent's MetLife insurance policy. *Ibid*. Decedent told Moore to secure that paperwork. *Ibid*.; *id*., Walker Testimony; *id*., Moore Jr. Testimony.

13. Decedent used his laptop computer regularly to manage his finances. *Id*., Moore Testimony; *id*., Moore Jr. Testimony. After he fell ill, Decedent used the laptop less and began keeping it in his room. *Id*., Moore Testimony; *id*., Gary Moore Testimony; *id*., Ronique Jones Testimony. The computer was password-protected, and Decedent, Carol, Moore Jr., and Smith had the password. *Id*., Moore Jr. Testimony. Smith had little need to use Decedent's laptop because she had her tablet. *Id*., Smith Testimony.

14. In or slightly before early April 2017, when Decedent was seriously ill, he asked Moore Jr. to bring his laptop to the hospital. *Id*., Moore Jr. Testimony. Moore Jr. brought the computer to Decedent's hospital room, where Smith and Joyce were with Decedent, and then

left. *Ibid*. Sometime after Decedent learned that he had terminal cancer on April 8, 2017, Moore Jr. helped Decedent make an online bank withdrawal to buy clothes. *Id*., Walker Testimony.

15. Decedent died on April 26, 2017. Doc. 50-1 at 71. He named Smith the executor of his estate. Doc. 48, Thomas Bucaro Testimony; *id*., Smith Testimony.

16. In May 2017, Smith submitted to MetLife a claim as the alleged beneficiary of Decedent's life insurance policy. Doc. 50-1 at 73. Smith did not realize until after Decedent died that he had a life insurance policy with MetLife. Doc. 48, Smith Testimony.

17. In June 2017, Moore submitted a competing claim to the policy. Doc. 50-1 at 20-22, 25-26. Moore and Smith consented to assignments of $9,285.78 to the Harwood Financial Company and of $2,696.80 to the Cedar Park Cemetery & Funeral Home related to Decedent's funeral. *Id*. at 84-86. After those deductions, $30,090.61 remained payable from Decedent's policy. Doc. 10.

## Conclusions of Law

Smith and Moore submit competing claims to the proceeds remaining from Decedent's MetLife life insurance policy. Doc. 1 at ¶¶ 14, 17, 19-20; Doc. 50-1 at 20-22, 25-26, 73, 85-86. Although Smith was the named beneficiary when Decedent died on April 26, 2017, Moore contends that Decedent did not make the request on April 8, 2017 to name Smith the beneficiary. Doc. 50-1 at 80; Doc. 1 at ¶¶ 15-16. Because no party has raised conflict of law issues, the court applies Illinois law to resolve the competing claims. *See Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018) ("In a diversity case such as this one, where neither party raises a conflict of law issue, federal courts apply the law of the state in which they sit."); *Prudential Ins. Co. of Am. v. Athmer*, 178 F.3d 473, 477 (7th Cir. 1999) (recognizing that there is no "federal common law" that is generally applicable to interpleader suits).

"Illinois … recognizes a strong presumption that the named beneficiary of a life insurance policy is entitled to its proceeds." *Davis v. Combes*, 294 F.3d 931, 936 (7th Cir. 2002); *see also Travelers Ins. Co. v. Daniels*, 667 F.2d 572, 573 (7th Cir. 1981) ("In Illinois, as a general rule, the named beneficiary of a life insurance policy obtains a vested right to the proceeds upon the death of the insured."). "The presumption is not, however, irrebuttable: it can be overcome on equitable grounds if the contesting party can show that [h]e was deprived of the proceeds by (1) fraud or constructive fraud, (2) breach of fiduciary duty, or (3) duress, coercion, or mistake." *Davis*, 294 F.3d at 936. Moore contends that "the beneficiary change naming [Smith] was done fraudulently," Doc. 1 at ¶ 15—by Smith or somebody at her direction, without Decedent's knowledge or consent—so Moore's effort to overcome the presumption falls within the first category.

To set aside the April 2017 beneficiary change to Smith based on fraud, Moore "bears a heavy burden of proof": He must establish "[e]ach element of the [alleged] wrongdoing … by clear and convincing evidence." *Davis*, 294 F.3d at 936. "To be clear and convincing, the evidence presented must leave no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Id*. at 936-37 (alteration and internal quotation marks omitted); *see also Bazydlo v. Volant*, 647 N.E.2d 273, 276 (Ill. 1995) ("Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense."). Given the record evidence, the court finds that Moore has failed to rebut the presumption that the April 8, 2017 beneficiary change entitles Smith to the remaining funds from Decedent's life insurance policy.

Critically, there is no evidence that Smith knew about Decedent's MetLife insurance policy on April 8, 2017, let alone that she knew the username and password necessary to request a beneficiary change through his online MetLife account. As an initial matter, Moore failed to rebut Smith's testimony that she did not know about Decedent's MetLife life insurance policy until after his death. There is the matter of the missing file folder, but nobody testified that the folder contained the MetLife login information (Decedent's username and password) that a successful online beneficiary change request would require. Doc. 50 at ¶ 8. Indeed, the fact that Moore found the original MetLife policy contract in another location (the safe in the basement) after the file folder went missing suggests that Decedent did not keep MetLife policy documents or login information in the file folder. Additionally, the fact that Decedent was sufficiently concerned about the missing folder to call the police, freeze his credit card, secure his papers, and have Moore Jr. retrieve his laptop, but did *not* take any action regarding his life insurance policy, further undercuts the conclusion that the missing folder contained sensitive information about the policy. As a result, even accepting Moore's theory that Smith stole the file folder around April 8 or 9, the court cannot find on this record that the folder contained the information necessary for her to log into Decedent's MetLife account and make herself the beneficiary of his life insurance policy. *See Davis*, 294 F.3d at 938 (holding that the party seeking to invalidate a written beneficiary designation failed to carry his burden where he "presented no direct evidence in support of any of th[e] essential elements of his claim").

Although Moore emphasizes the timeline of when Smith learned of Decedent's terminal cancer and when the beneficiary change occurred, that sequence of events weakly supports (at best) his theory that Smith learned Decedent was dying, stole the folder, obtained the login information, and requested the beneficiary change. MetLife recorded the online request for a

beneficiary change shortly before 10:00 a.m. Chicago time on April 8, 2017, Doc. 50-2 at 3, but Decedent's doctors did not tell him (and Smith) that he was dying until that afternoon. True enough, Smith could have stolen the folder and requested the change within the first hour of the window that Decedent gave the police for when the file folder went missing—9:00 a.m. on April 8 to 4:00 p.m. on April 9—but she would not yet have learned from Decedent's doctors that his death was imminent, so the key motive Moore posits for her fraud was not yet present.

Moreover, despite Moore's and Moore Jr.'s general assertions that Decedent was too sick by early April 2017 to have used his computer to request a beneficiary change, the evidence shows otherwise: During that timeframe, Decedent kept his laptop in his room, directed Moore Jr. to bring the laptop to the hospital, and worked with Moore Jr. to place an online lock on a social security number and to make an online banking transaction. Given that Decedent previously had sufficient aptitude to create his online MetLife account and set up automatic premium payments, and given that he contemporaneously took relatively sophisticated steps to safeguard his property and his grandson's social security number once he believed a theft had occurred, Moore fails to show that Decedent could not have made the April 8, 2017 beneficiary request or that, given MetLife's multiple communications, he did not know or approve of the request.

Finally, although Moore considers it suspect that he remained the policy's beneficiary for some 27 years before Smith suddenly became the beneficiary weeks before Decedent died, there is nothing inherently suspicious about a policyholder changing beneficiary designations near the end of life. It is natural for a person to reassess how his property will be distributed when death is imminent. *See Hill v. AT&T Corp.*, 125 F.3d 646, 649 n.6 (8th Cir. 1997) ("As her illness progressed, [the decedent] certainly had both the opportunity and the incentive to get her affairs

8

in order so that her wishes regarding the disposition of her assets would be honored upon her death."). Indeed, having made Smith the executor of his estate, it is hardly surprising that Decedent would have decided that she deserved his life insurance policy's benefits as well. The fact that the change was relatively last-minute, absent further evidence that Decedent was incapable of requesting the online beneficiary change or that Smith had the information necessary to request the change, cannot clearly and convincingly show that the new beneficiary designation resulted from fraud.

In sum, although the evidence does not *foreclose* Moore's theory that Smith fraudulently made herself the MetLife life insurance policy's beneficiary, Moore comes nowhere close to proving by "clear and convincing evidence"—or even by a preponderance of the evidence—that the beneficiary change was fraudulent. *Davis*, 294 F.3d at 936. It follows that he fails to carry his "heavy burden" to rebut the "strong presumption" under Illinois law that Smith, as "the named beneficiary of [Decedent's] life insurance policy[,] is entitled to its proceeds." *Ibid*.

## Conclusion

The court will enter judgment for Smith in the amount of $32,084.78—the amount of policy benefits and accrued interest that MetLife deposited in the Clerk's registry account, Doc. 10—plus the interest that has since accrued in that account. Because MetLife waived its right to seek attorney fees and costs when seeking a discharge from further liability, Doc. 14 at 6, the Clerk is directed to release to Smith all registry account funds associated with this case.

July 10, 2019

United States District Judge